First matter this morning are cases 4-17-0934 and 4-18-0137. Ken Ray, the Marriage of Van Hook. Counsel, could you state your appearances for the record, please? Gerald Timmerwolke for the Appellant to the Court. David Liefers for the Appellant. All right, thank you. Mr. Timmerwolke, are you ready to proceed? We are, Your Honor. You may. Thank you. Good morning, Justices. In regard to this case, it was a divorce that started and went on two years and two months. And Judge Legowski, after hearing much evidence, had to determine what the retirement distribution of Linda would be. Linda is my client, Linda Van Hook. There was a short period of time that she worked for a school district as a bus driver, and she accumulated a very small amount of IMRF funds. But then she went to work for the State of Illinois with the Department of Corrections and accumulated another retirement through CSRS. In regard to the opinion, it ended up being a very simple opinion that she wrote after having, as I said, about 19 months of trial and various petitions and I think of three days of trial. But at that time, on C-152, it indicated that she has the retirements, and it says that the respondent in the case, which would be the appellee, hired Dr. Langford. He did a present-day value of the retirement with the IMRF and State of Illinois, and as of September 10, 2008, he came up that it had a value of $255,221. My client at the time was in remission from cancer, and she was asking the court to adopt the value, which would be her cash-in value at that time, which was much less, of $40,150. In the decision, in the opinion of the court, she says, the court has considered both positions in the health and age of the parties and will divide the pension equally by quadro and by childro. That is what she ordered. Both parties subsequent to that time filed motions to reconsider. Our motion to reconsider, my client complained that she wanted the court not to start on the date of the marriage and go to the date of the divorce, which was February 10, 2010. She wanted the court to go to the separation because of the lengthiness of the proceedings, which she blamed on the respondent, Ernie. Mr. Liefers filed a motion to reconsider. This is at C-205, and he said that he disagreed with that, and he asked the court to do it to the date of the divorce in February. There were other issues involved in both those post-trial motions, and ultimately the parties came to an agreement where both of those motions would be withdrawn concerning the pension. That order was entered by agreement after we had several hearings and we finally came to an agreement on it. On October 27, 2010, that order was entered. This case, and what I'm asking you to consider, is what I believe to be the decision of Judge McCartney, who was thrown into this later because Judge Legowski's decision was very simple. I'm dividing it equally. She didn't give any further instructions, so Judge McCartney took over from her, had the case, and in my opinion struggled with the decision, originally found and followed the position of the appellant by determining that we're only going to give 50% of the time from the date of the marriage to the date of the divorce. Has a quill drill ever been entered in this case? No. The order of Judge Legowski back in February of 2010 was that the pension was to be divided equally through a quill drill. Right. What are we to make of the fact that all of that time passed, years passed with no quill drill in place? Wouldn't it have been in your client's best interest to have had a quill drill entered right then and there if the pension benefits were to be determined as of the date of dissolution? It would have been, and I agree with that, but her feeling was that the respondent was receiving the benefit and he should have. I was ordered to do the judgment, but I don't think anybody was ordered to do the quill drill per se. So we assumed at that time that Mr. Ernest Van Hook would enter the judgment because it was in his best interest to do so. That's the best answer I can give you, and I wish it would have been entered back then. In regard to the Wisniewski case, it's enlightening, and Judge McCartney struggled with that case and reviewed that case a lot and listened to the arguments constantly. But in that case, the court specifically said about a pension, jurisdiction is continued and retained to a portion between the parties according to the marital share and supervised payments of the pension, and here's the key words that we're asking this court to consider, if, as, and when it becomes vested in and payable to Thomas. Thomas shall promptly notify the court and Virginia as soon as the retirement date is known so that the court can appropriately deal with the pension. In page 632 of 221 Illinois Decisions, in that same ruling, the court went on and talked about how there's two alternate procedures for apportioning pensions that are unmatured, and one of them is the cash-out theory, which Mr. Liefers had Dr. Langford do, and the other one would be the reserving jurisdiction, and there's two formulas suggested. Of course, one is you take the pension amount at the date of the retirement, divide that by the total number of years that the pensioner worked, multiply it times the number of years of the marriage, and divide by two. Our position, and why we're here on this appeal, is that's not what Judge Legowski ordered. The second way to do it is to say, we're going to look at this when they retire, if, as, and when they retire, and Judge Legowski did not say that. So we argued before Judge McCartney that we had that figure. It was in Petitioner's Exhibit No. 7, Admitted, and that was admitted. It's part of Appendix A-11, page E-324, where our position was that the amount of monthly pension accumulated during the marriage, for that part from the marriage to the date of the divorce, would have been a total pension amount of $1,226.25, payable as of May 1, 2010. That's as close as we could get. The divorce took place in February, but that was the figure we urged the court to accept. Mr. Timurwoki, can I interrupt you for a moment? Sure. Your argument is that Judge Legowski chose the cash-out method. Right. She said, we're going to cut it in that way. Under Wisniewski, isn't it then part of the cash-out method that the court determines the present cash value of the pension and make that determination at the time it assigns the equal values? It says in Wisniewski, under this approach, and it's talking about the cash-out approach, the court attempts to compute the present value of the pension with a discount to reflect the possibility that it will not vest. Did Judge Legowski do that in this case? No, she rejected it, Your Honor. And it's said in her decision. She had two figures in front of her, the $255,000 and the $40,000. She said, I'm not accepting either one. Our position is, she said, I'm cashing it out. I'm not reserving jurisdiction, if, as, and when. I'm not doing the formula. Mr. Van Hook gets from the date of the marriage to February 10, 2010, the date of the divorce. And that's what we submitted in Petitioner 7. Mr. Liefers, of course, as an advocate for his client, did what I'm arguing to the court would be the formula, where he took the total amount when she retired and divided by the number of years, multiplied it times two, and he came up with a figure. Our figure for his half is $613.13 per month. Mr. Liefers' figure is $1,160.05. Hence, this is a $547 per month difference in the positions that the parties submitted to the trial court. So this is where the argument in this case is, and I guess it's a matter of, you know, what was Judge Legowski's true intent. Our position, and why we're here, is that it was not her intent to do a formula. It was not her intent to say we're going to divide this if, as, and when. She didn't add that language. All she said, and motions were filed to determine the dates, and that motion ultimately was date of marriage to date of divorce. Is there any indication in the record that at that time, in February 2010, she was presented with the Wisniewski language that it needed to incorporate the if, as, and when words that you just identified? I'm not aware of any. I do not believe that that be the case. So the fact that she didn't use those magic words, is that what we're to base our determination on here? That's what the appellant is asking the court to do, that she did not choose to do that. She did not choose a formula. She did not choose if, as, and when. She used the words reserved jurisdiction. What are we to make of that? Our position on that is she knew it had to be by quadro or quildro. So the jurisdiction, if you read it, was very simple. It says this court retains jurisdiction over the party. Well, I'm sorry. It was simply to have a quadro order in. The court has considered both parties, the age and health of both parties, and will divide the pension equally by quadro or quildro. So that's the only way you can divide it. Counsel, I'm not sure I understand what your formula is. I know you're going from the date of marriage to the date of divorce. What's the rest of your formula? Our formula was put out by the state retirement system saying if she retired on May 1st, 2010, she would have received $1,226.25. That's what we asked the court to adopt. And Judge McCartney initially adopted our position. Okay. Where did the 1,200 figure come from? That would have been the amount that the state retirement system calculated had she retired at that time. What we have is work for six more years, Justice Turner, after that. And then because of the additional time, the additional pay increases, and she hit the 20 years, that enhanced it to another. So then you each presented to the trial court a proposed quildro, one with the $1,200 figure. Correct. And then the other, what did you say that one was? Mr. Leifers was $1,160. Okay. I still don't understand why it wouldn't have been in your client's best interest at the time of Judge Legowski's judgment to have tendered a quildro along the lines of what you're suggesting here, to have established it all those years ago so that you wouldn't have gotten to this point, having to make the argument this is what Judge Legowski meant. So to me, I'm not sure that we're able to discern this intent this late in the game. And you indicated earlier in response to my question that it would have been in Ernest's best interest to have the quildro entered then. And to me, it seems like it would have been in Petitioner's best interest to have the quildro entered back then if it was Judge Legowski's intent to utilize the cash-out approach. My response to that would be twofold. Number one, at the very end of her opinion, she ordered me to prepare the judgment, but did not order me to prepare the quildro or the quadro. My other point of it would be that she, my client, would think it would be incumbent upon the respondent to want to do that, and she shouldn't lose what the judge has written in her opinion because of the time delay. I mean, she shouldn't be punished because of the time delay. It could have been done then. It can be done now. Was it anticipated by the parties or by their counsel or by the court, either directly or by inference, that she wasn't going to work another six years? I mean, if the judge had known that this wasn't an impending retirement, which I think you might infer because of health issues, would she have done something different? She did make a finding that both parties, and this would be in her findings and her opinion, that both parties continued to work. Ernie was on Social Security. It says she was in remission. It was continuing to undergo treatment. He was 65. She was 59. They're both working, and they're both self-supporting. And so I take it from that finding, Justice Knapp, that she anticipated that there would be continued work. And there was nothing. I mean, my client was working at the time. She did talk about her cancer, but it was not a situation that there was a terminal diagnosis by her physician at that time, sir. Well, that's all I have unless you have anything else. Okay. Thanks, Tim. Well, thank you. You'll have time in rebuttal. Thank you. Mr. Liefers? Thank you, Your Honor. May I please report? Come and look. It would have been in everybody's best interest to have a quill drill entered back in 2010. I think obviously, based upon the questions of the court, it probably would have been in Linda's best interest more so than Ernie's to have that decided at that point. If that's what Judge Legowski intended with regard to Linda's position, that is that essentially we pretend like she was retired at that time and then we fix Ernie's share of her retirement as if she were retired at that time. How would that be to your benefit? What, to have that order entered? I mean that more generically with regard to Ernie. Obviously, it would have benefited Linda. Generically, it would have benefited Ernie to have this decided years ago and we wouldn't be here today. So that's what I mean in that regard. But essentially, look, as Mr. Timberwolke indicated, we had multiple hearings in this case. Judge Legowski was presented with the report of Dr. Langford at that time. He was also presented with Mr. Timberwolke's evidence with regard to what Linda's contributions had been to the retirement as of that point in time. She chose not to adopt either the cash out or immediate offset method and she chose not to basically limit Ernie's benefit to the contributions Linda had made. And she made that argument based upon her health, which again, as Mr. Timberwolke has indicated, Linda was in remission at that point and she was continuing to work. There was, in fact, no evidence that I recall that Linda intended to retire or that her retirement was pending or imminent. So what Judge Legowski ruled was essentially that the retirement benefits would be divided equally. The problem is that back then, she didn't really choose a method of allocating these. And again, it would have been obviously beneficial and perhaps we wouldn't have been here today if we had either party presented the quid pro at that time. The argument could have been made and maybe this would have been resolved. But nonetheless, here we are. Judge Legowski's words, the petitioner's retirement shall be divided equally through a quid pro order, could be as equally applicable to a cash-out analysis as it would be to a reserve jurisdiction analysis, right? She's just there identifying that whatever date you choose, whether it's date of dissolution under a cash-out method or a reserve jurisdiction approach using petitioner's retirement date, the retirement benefits are going to be divided equally? Is that accurate? Her intent, obviously, was... But putting aside her intent, just the words that she used, shall be divided equally, does that communicate something about whether or not she was... that only the cash-out method would have been appropriate as opposed to a reserve jurisdiction approach? I'm not too sure that's what that means, Your Honor. I mean, again, with all due respect to Judge Legowski, the language that she chose, and I suppose even one of us could have asked for clarification at that point, but the language that she chose was somewhat generic. In part, she had before her Dr. Lankford's report, which basically assumed the value of Linda's pension benefits was based upon her retirement at age 60. And again, there was no evidence that she was retiring at that point in time. I truly believe that Judge Legowski intended that the benefits for the marital portion of those benefits be equally divided when she retired. Now, did she use the magic language that's referred to in the Lesneski case and other cases? No, she did not. But I believe that that was her intent. The problem is that her intent, I think, is not clear. And then when we come back to court in front of Judge McCartney, I think what he was called upon to do was to try to interpret that intent on the part of Judge Legowski. And as apparently as Mr. Timberwolke admitted a moment ago, when she used the language, we'll divide the pensions equally by quadril slash quildril, it was a matter of intent and it is ambiguous. And I think Judge McCartney understood the ambiguity of it, if you will, when he struggled with how to approach this. What method should he adopt? Initially, he adopted the method suggested by Mr. Timberwolke. Then he later reconsidered that in light of some of the thoughts, if you will, of this court in the Lesneski case. He thought that it would be appropriate to divide it, taking into account her enhanced benefits because she, in fact, didn't retire for in excess of six years. Let me ask a question. Sure. If there is an ambiguity, why would we assume that the trial judge was going to reward your client by getting a larger share of the pension, given that if she didn't retire for a year or two years or five years or six years, his share of it would be higher? When she identified him as being responsible for credit card debt, manipulating the party's finances, not paying what he was supposed to pay, I don't understand why a trial judge would do that, if the trial judge had a choice. I mean, it's acknowledged that you're going to get more as the pension benefits build up. Why is he entitled to more? Why is he entitled to 50% later rather than 50% now? Because he's, you know, I don't want to characterize him as the bad guy, but the trial judge obviously placed some fault upon him for the party's finances. I think the trial court, Judge Legowski, in her findings, I think she suggested obviously my client played it fast and loose, and she also suggested that Linda wasn't as ignorant or as innocent of that as she claimed during the course of the trial, because for a long period of time, she was involved in that business as well. I think the fact that he played it fast and loose was taken into account by Judge Legowski when she made the ultimate division of the other property. All right. Because it's disproportionate toward... Absolutely. All right. Let me ask a quick question in regards to the two orders that were appealed. There were two notices of appeal. One was the December, no, excuse me, November 20, 2017 order, which granted, I think it was a motion to reconsider and for clarification. Yes, sir. Then I think Petitioner filed a motion to reconsider that order, but also filed a notice of appeal on December the 19th. Then there was a subsequent order on February the 20th, 2018. How do we have jurisdiction to consider that February 20, 2018 order when there was a notice of appeal filed in December? Doesn't the trial court lose jurisdiction to do anything in the case following the filing of a notice of appeal? Obviously, I didn't raise that issue, Your Honor. When Judge McCartney entered his ordering in November... You don't have to address it here. We have an independent duty to identify our jurisdiction. If you don't have any comments on it, that's fine, but I do ask Mr. Timerwilke and his time to address that. Counsel, are you going to respond to that? Yes, sir. I think there is an issue with regard to the court's jurisdiction. First of all, you have the November 20th order, you have a motion to reconsider, then you have a notice of appeal, and then you have a subsequent motion to reconsider, and I don't believe that there's even authority for that, and then you have a notice of appeal with regard to the February order. I didn't raise it, but I think that there is some issue with regard to the jurisdiction of this court. Yes, sir. It appears to me that the court found that your client owed Linda $20,000. I can't figure out from reading the briefs whether she ever got that. All right. The second issue raised by Linda in this case relates to a petition for rule or she'll pause. All right. What she alleged in that is that Ernie basically didn't pay the Williams Street property debt, it was a mortgage debt, and didn't pay Chase credit card. Essentially, with regard to the Williams Street property debt, the court found that, in fact, and I don't want to put it this way, but, in fact, Ernie should have paid $20,000 or Linda was out $20,000 or whatever, and what Judge McCarty then tried to do is he tried to basically use that as an offset against what Linda would owe Ernie by virtue of the retirement. All right. Essentially, with regard to the credit card debt, he did the same thing, but he reconsidered that in light of being further informed, if you will, that Chase had written that debt off and they weren't pursuing it. So what Judge McCarty did was, and I think what he'll do on remand, because this is what he's already talked about, is that he found that Linda was entitled to a $20,000 offset against any, if you will, rearage payments that she would owe Ernie by virtue of the retirement benefits, and that's the way he handled that. That's what will happen when it goes back. That's correct, sir. If we were to affirm the judgment, it just goes back to the trial court, to the trial court to determine what the amount of the pension rearage is that petitioner owes and then how much that offset should be, and the trial court has already determined that that $20,000 should be offset. That's correct, and that was not appealed for. Okay. And you're not disputing that? No, we're not disputing that. Okay. I have one other question before you run out of time. I noticed that you had presented a quill drill. It appears to be a form that you got from the SCRS. It is. Right, and I know they provide those, and I noticed that where it says how you're going to establish the monthly retirement benefit, the very first line under A1 has a blank dollars per month, and then the second line is 50% and then the formula. That's the one that, of course, you're arguing for, as far as. Well, it seems to me that SCRS, at least, contemplates that that first line could have been filled out for what counsel is arguing for, that it's so much per month. A dollar figure based upon date of marriage up to date of divorce. Am I reading that correctly? Well, that is part of the form. Yes, you're reading that absolutely correctly, and it would have been appropriate to fill in that if Judge Legassi specifically found, as Mr. Timberwolfy is suggesting she implicitly did, that my client's benefit was going to be based upon 50% of the amount as if she were retired upon date of judgment. Right, so I am understanding correctly. That is a possible formula that SCRS will accept, and that's what opposing counsel is advocating.  Okay. There's no question about it. Thank you for clarifying that. But I would also think that Judge Legassi was well aware of the Hunt Proportionality Rule and all the law that followed that, too. So, again, we're required to second-guess, and Judge McCarty did what he thought was right with regard to that. I don't know. Do you have any questions with regard to the second argument that Mr. Timberwolfy is making with regard to the rules show cause? I don't. Okay. All right. It's easier, the two, actually. Well, if there are no other questions, thank you. Okay. Thank you, Mr. Liefers. Rebuttal argument? Mr. Timberwolf? Yes. And when I addressed the court and said, Good morning, I forgot to say good morning, Mr. Liefers. Good morning, Mr. Liefers. Good morning. Good morning, Mr. Liefers. Justice Harris, in regard to your question about the filing of the two appeals, it's an interesting, good question. On 7-6-17, Judge McCartney ordered three things. Number one, he adopted our position that, as Justice Turner just said, that we're going to look at the date of marriage to the date of February 10, 2017. But we only had the main figure. That's all we could get. Number two, Ernie was found because of manipulation and so forth, and he didn't pay bills, that there was a credit card that my client had on her credit record of $15,000, and he was supposed to pay it. He never paid it. So she would be allowed an offset of that $15,000 chase bill, and she could pay it. In other words, instead of paying him the retirement, she could clear her credit by paying it. Number three, that she had to pay a mortgage payment on a house that he was awarded because the bank was suing her, and he did find my client to be credible in that. Judge McCartney found her to be very credible in that hearing. I think there was two findings. So those were the three issues originally decided in July. In both parties, the motion to reconsider, a post-trial motion was filed by Mr. Liefers. Then on 11-20, that was heard, and when that was heard on 11-20, he indicated that the $20,000 would stand, but he adopted Mr. Liefers' request that we take what I'm going to call the reserve jurisdiction formula. We take the amount at the end when she retired, and he did it by looking at Winniski and saying, well, he should get the benefit of the additional time because he didn't get the money. Well, my argument to that is she didn't get the money either. She's still working paying bills. So that happened on 11-20, but at the very end of that hearing, he said, I want to have a telephone call because we were still debating this credit card, and the credit card issue, Mr. Van Hook was saying that's a debt that's no longer enforceable. It's eliminated, which he ultimately proved by getting information and got it to Judge McCartney. So Judge McCartney wiped that out. He said, I'm not going to allow the offset for the credit card because he proved up that the credit card company, Chase, wiped it out. So I was in a dilemma because I had to decide, as the appellate court, if I wouldn't have filed that second appeal, I'm going to say today, well, you missed your 30 days. So that's the reason that I filed that appeal, but then when I filed the new appeal, when the last order came out that ruled, I then asked to consolidate, and they've been consolidated. The only last thing I would like to say is you asked, well, why wouldn't we have a cutoff date back when Judge Legowski had it? I think when my client was satisfied at the very end because of the motions to reconsider that it would be from the date of the marriage to the date of the judgment. Her argument was it should go date of separation because this thing drug out, and the bottom line is she felt that it was a situation that it had been set at that time. Additionally, quite frankly, she thought Mr. Liefers should prepare it for the cost and legal expense of having it done and having to deal with SERS. So that's what I have to say in rebuttal. Thank you. Okay, thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.